UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SERENA BURKARD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CAUSE NO. 1:14-cv-0515 TWP-DML |
| ) | |
| FINNER N FINNER ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

### I.   INTRODUCTION

Plaintiff, Serena Burkard (hereinafter "Burkard" or "Plaintiff"), was employed by Defendant Finner N Finner (hereinafter "Finner") at one of its franchise Jimmy John's restaurants located on East 86th Street in Indianapolis (Nora), as an 'In-Store' employee. Burkard was supervised by Person-in-Charge(PIC)/Shift Manager Ana Anzorena [Ana Anzorena Depo. pp. 8; 11] attached as Exhibit 2;Store Manager Michael O'Rourke [O'Rourke Depo. pp. 24] attached as Exhibit 2; and Area Manager Ronald Strainis [Strainis Depo. pp. 9-11] attached as Exhibit 3 (hereinafter "Anzorena" "O'Rourke" and "Strainis" respectively). In-store employees perform duties as sandwich makers, cashiers, restocking and cleaning. There are Drivers who also work in these these stores who deliver sandwiches, but from time-to-time, perform in-store duties as well; and, are covered under the same company policies and procedures [O'Rourke Depo. pp.25-26].

Plaintiff began her employment with Finner on or about May 9, 2013, until her termination of employment on December 16, 2013. At the time Finner hired plaintiff she was pregnant, but did not immediately disclose that fact to Finner.

1

O'Rourke sometime in July 2013 learned that Burkard was pregnant [O'Rourke Dep. pp.32-36]. O'Rourke had complained to Burkard that he would have to cover her absences while she gave birth [Burkard Depo. pp.69] attached as Exhibit 4; After Burkard gave birth, Burkard's Scheduled working hours were reduced [Burkard Depo. pp.36]; Finner took disciplinary action against Plaintiff for uniform and attendance violations, and then terminated Plaintiff's employment for attendance and uniform violations [Exhibit 5].

In its Motion for Summary Judgement, Defendant contends that Burkard was terminated for violating its Attendance and Uniform Policies. As discussed below, summary judgment is inappropraite because while the employer's policies were supposed to apply equally to all of Finner's employees, it was applied to Burkard, a pregnant female, in a disparte manner. Under these circumstances, Defendant's Motion for Summary Judgment should be denied.

## II.     STATEMENT OF MATERIAL FACTS IN DISPUTE

1. Each of Burkard's former supervisors have attested to her wearing an improper uniform. Because of this alleged non-compliance with Defendant's uniform policy, Burkard received discipline in the form of a written warning/termination [Exhibit 6], which provided the basis for the termination of her employment.

Response: Disputed. As set out in deatil *infra,* Burkard's being out of uniform would not have been considered a violation of the Defendant's uniform policy by comparison the treatment of similarly-situated individuals. For reasons set out in deatil *infra,* Plaintiff disputes that a uniform violation was the motivating factor behind her discipline.

2. Each of Burkard's former supervisors have attested to Burkard's repeated tardiness and absences. Because of this alleged non-compliance with Defendant's attendance policy,

Burkard received discipline in the form of a written warning [Exhibit 6], which later provided the basis for the termination of her employment.

<u>Response</u>: Disputed. As set out in deatil *infra,* Burkard's absences and tardies would not have been considered a violation of the Defendant's attendance policy by comparison the treatment of similarly-situated male individuals. For reasons set out in deatil *infra,* Plaintiff disputes that her absences and tardies was the motivating factor behind her discipline.

3. Burkard was a "no-call/no-show" on two dates in December, 2013.

<u>Response</u>: Disputed. Plaintiff clearly testified that she notified the Employer of her need to be absent from work on the "I Need A Sub Sheet" [Plaintiff Depo. pp.80]. As set out in deatil infra, Burkard's absence from work would not have been considered a violation of the Defendant's attendance policy by comparison the treatment of similarly-situated employees. For reasons set out in deatil infra, Plaintiff disputes that her absence was the motivating factor behind her discipline. Furthermore, another similarly-situated employee, not of the protected class (pregnant) had filled out the I need a sub sheet, was a no/call no/show and was not terminated from employment [Plaintiff Depo. pp.89-90]).

4. Burkard did not submit a doctor's note to O'Rourke in connection with either of these absences.

<u>Response</u>: Disputed. Plaintiff clearly testified that she had brought medical excuses for absences in December [Burkard Depo. pp.75-80].

5. At no time prior to or during that meeting did Burkard ever refer to her pregnancy or claim that she was being discriminated against on the basis of either her gender or pregnancy.

<u>Response</u>: Disputed: Plaintiff clearly testified that she had complained about discrimination at Finner N Finner [Burkard Depo. pp. 74-76].

3

### III.     STATEMENT OF ADDITIONAL MATERIAL FACTS

A. <u>Finner Enforces the Attendance Policy Discriminatorily</u>

i.     <u>O'Rourke applies the Attendance Policy to Serena Burkard</u>

Approximately, two weeks after giving birth, on or about Aug 14, 2013 O'Rourke began discipline against Burkard under Defendant's Attendance Policy. Burkard recived a Written Warning from O'Rourke for being late to work 19 minutes. The date of the occurrence was August 13, 2013. [Exhibit 6].

ii.    <u>O'Rourke does not count tardies/absences against other store employees</u>

Serena Burkard, an In Store employee for the time she was employed by Finner (May through December 2013), Burkard was was tardy 40 times and absent 6 times [Depo. Exhibit F attached hereto as <u>Exhibit 7</u>].[1]

Edwin Figueroa (male), an In Store employee supervisied by O'Rourke, was issued the same Finner Attendance Policy as Burkard. During the same time frame Burkard was employed by Finner (May-Dec 2013), Figueroa was tardy 68 times and absent 29 times [Depo. Exhibit H attached hereto as <u>Exhibit 8</u>]. Figueroa's record, as compared to Burkard's, was worse than Burkard's, however, Figueroa was never disciplined, nor was he given a Written Warning and/or terminated from employment for his tardies and/or absences.[2]

Samuel Becker (male), In Store employee supervisied by O'Rourke, was issued the same Finner Attendance Policy as Burkard. During the same time frame Burkard was employed by

---

[1] Store Manager O'Rourke testified that he was not aware of attendance records which were worse than Burkard's (O'Rourke Depo. pp.52:10-13), yet O'Rourke testified at deposition that he reviews these reports each week ["punch-ins"] for every employee (O'Rourke Depo. pp30-31). Person in Charge Ana Anzorena testified that she never reviewed Plaintiff's attendance records (Anzorena Depo. pp. 16), but later testified that she did review Burkard's record during her employment (Anzorena Depo. pp. 35).

[2] In Response to Plaintiff's Request for Production of Documents requesting those records showing all disciplinary action taken at the E.86th Street store for period May through December 2013, Finner did not produce any disciplinary records for Figueroa, Becker or Clements.

4

Finner (May-Dec 2013), Becker was tardy 32 times and absent 17 times [Depo. Exhibit H attached hereto as Exhibit 9]. Becker's record, as compared to Burkard's, was worse than Burkard's, however, Becker was never disciplined, nor was he given a Written Warning and/or terminated from employment for his tardies and/or absences.

Alex Mondbach (male) a Driver, supervisied by O'Rourke, and was issued the same Finner Attendance Policy as Burkard. During the same time frame Burkard was employed by Finner (May-Dec 2013), Mondabach was tardy 69 times and absent 7 times [Depo. Exhibit H attached hereto as Exhibit 10]. Mondabach's attendance record, as compared to Burkard's, was worse than Burkard's, however, Mondabach was never disciplined, nor was he given a Written Warning and/or terminated from employment for his tardies and/or absences.[3]

### iii. O'Rourke Reduces Burkard's Scheduled Working Hours

Figueroa, Becker and Mondabach's attendance record, as compared to Burkard's, was worse than Burkard's, however, neither Figueroa, Becker or Mondabach had their scheduled working hours reduced because of their attendance [Exhibit 11]. O'Rourke testified, that Burkard's hours were reduced because of job performance (i.e.,attendance and uniform issues) (O'Rourke Depo. pp.36)).

### iv. The I Need a Sub Sheet

The I need a sub sheet appears to be something of an unwritten and a questionably communicated policy at Finner's East 86th Street store.  While not appearing in any handbook or written policy, Finner appears to enforce this 'unwritten policy' under the auspices of the attendance policy. There is a material issue of fact whether this unwritten policy -- where it's the

---

[3] Anzorena testified that Alex Mondabach (male) had a worse attendance record than Burkard and was not disciplined for his attendance [Anzorena Depo. 39-40]. Strainis testified that Mr. Figueroa's attendance record was not acceptable (Strainis Depo. pp. 65).

5

employee responsibility to have a requested absence covered by another employee -- and whether it was ever effectively communicated to employees, which again appears to be the basis of Burkard's termination under the Attendance Policy.

Area Manager Stranis testified that I need a sub sheet was not covered during new-hire orientation; he assumed the employee would see it and understand what it was; that store management was looking at it 'every day', and when asked where one could find this "I Need a Sub" policy in the employee handbook, Strainis referrred to the policy on the Family Medical Leave Act, or referred to the calling off procedure. Strainis could not say whether this policy was ever communicated to employees [Strainis Depo. pp. 29 -34], but yet Burkard was discharged from employment for a no call/no show after placing her name on the I need a sub sheet requesting days off.

Strainis testified that when asked again where to find the policy stating where it was the employee's responsibility to find their replacement when absent from work, Strainis testified as follows:

> Q: Let me ask the question this way: Referring to Finner's attendance policy, can you show me in that policy which is given to employees where it states that it's the employee's responsibility to cover their own shift in the event they're absent?
>
> A: Obviously, I'm overlooking something. So no, I can't.
>
> Q: MR. RABINOWITCH: Why don't you review the handbook and find it and review the attendance policy.
> A: (Deponent reviews document.) So I guess it would be on page 30 of the handbook.
>
> Q: You're referring to the attendance policy?
>
> A: Yes, sir.
>
> Q: Now, in that policy can you tell me where it says that if the employee's to be absent, it's their responsibility to find a substitute?

6

A: "If an employee is unable to report to work (or report to work on time) for any reason, that employee must notify his or her supervisor before the employee's starting time."

Q: Okay. So if I fill out the I Need a Substitution Sheet, would you consider that to be notifying the supervisor of the need to be absent?

A: No.

Q: But didn't you testify that supervisors are looking at this sheet daily?

A: Yes.

Q: And the employee would state or write on this sheet I need to be off this day?

A: Yes.

Q: Okay. So you're saying that that isn't notifying supervision?

A: No.

Q: Well, what would you call it?

A: What would I call that?

Q: Yes.

A: I would call them trying to -- the employee trying to get their shift covered.

Q: So filling out this substitution sheet isn't notifying the supervisor of the need to be absent?

A: No, sir.

Q: Well, under this policy what would constitute notifying the supervisor? Is there a form they need to fill out?

A: No.

Q: Do they send a text message?

A: They could send a text message or call.

Q: Or an e-mail?

A: They could e-mail.

7

Q: But filling out this form wouldn't cut it for you?

A: No. People fill out that form for all sorts of things.

Q: Well, other than finding a substitute, what other reason would they fill the form out?

A: Well, I mean you're placing it as a doctor's appointment. Yes, that's something you should approach a manager about and not just put on the I Need a Sub Sheet. Somebody that wants to go to a concert, that's not a priority.

Q: So how are they informed about this process?

A: They're not.

Q: They're not. They're not told?

A: Nope.

[Strainis Depo. pp. 37-40].

Ana Anzorea, Burkard's Shift Manager could not testify either as to where the I Need A Sub Policy could be found (Anzorena Depo. pp. 27).

Strainis then went on to define what is a no call/no show under Finner's Attendance Policy:

Q: Define for me what is a no call, no show.

A: It's pretty self-explanatory. If you don't call for your shift prior to your shift and let the manager know that you're not going to be there for an emergency and you don't show up, then it's automatic termination.

Q: Now, the policy talk about notifying the supervisors by phone or other means. What is your understanding of "other means"?

A: A pay phone. I don't -- a text message, any form of contact with a human being.

Q: Any form of communication?

A: Yeah.

Q: Including filling out the I Need A Sub Sheet?

A: I don't know if that's a form of communication.

Q: Well, it's a written form of communication; would you agree with me?

A: Yes.

8

Q: It's an employee putting a date on that piece of paper stating that he's going to be or she's going to be absent on this particular date. Right?

MR. RABINOWITCH: Objection. Misstates his testimony and misstates what that document –

Q: Would the I Need A Sub Sheet be a form of communication?

A: No.

Q: It's not?

A: No.

Q; What would you call it?

A: I would call it a -- a -- a way for an employee to express their options to get their shifts covered.

Q: Now, on this I Need A Sub Sheet, would the store manager initial it?

A: After the shift had been picked up by another person.

Q: So a manager is looking at this document?

A: Yes.

Q: And the manager is learning about an absence?

A: When –

MR. RABINOWITCH: Objection. Again, misstates what this witness has said. He's said very clearly that it's a document upon which an employee tries to identify -- is identifying a shift that needs to be covered, not an absence.

MR. PANICO: Okay.

MR. RABINOWITCH: And you've repeatedly interchanged those and that's not --

Q: So an employee needs to have a shift covered because they're not going to be there. Correct

A Yes.

Q: On a day that they're scheduled to work. Correct?

A: Yes.

Q; So they're filling out this sheet because they're not going to be at work on the scheduled day. Correct?

9

A: No. Wrong.

Q: Okay. Then if they're scheduled to work on a Monday and they want to be off work for Monday and they're trying to find somebody to cover their shift for Monday –

A: Yes.

Q" -- that's the purpose of the sheet. Correct?

A: Yes.

Q: So they're going to be absent from work on a scheduled day. Correct?

A: Not to my knowledge from looking at that sheet, no. You said that they're trying to cover their shift for that Monday.

Q: Because they want to be off from work?

A: I don't know that.

Q: Well, if they're not coming to work on a scheduled day, what would you call that?

A: What do you mean? Can you say that again?

Q: If you're scheduled to work on Monday –

A: Okay.

Q: -- 9:00 to 5:00 –

A: Okay.

Q: -- and you're not going into work --

A: Okay.

Q: -- Monday 9:00 to 5:00 –

A: You know that you're not going into work already?

Q: I'm asking for this day to be covered –

A: Okay.

Q: -- because I'm not coming to work –

A: Okay.

Q: -- for whatever reason –

10

      A:      Okay.

      Q:      -- I'm going to be absent from work that day?

      A:      Okay.

      Q:      Do you agree with me?

      A:      Yeah.

[Strainis Depo. pp. 44-47].

Anzorena testified that the ['I Need a Sub Sheet"] was the primary way that management would learn of the employee's need to be absent from work [Anzorena Depo. pp.29].

    B. <u>Finner Enforces the Uniform Policy Discriminatorily</u>

Each of Burkard's supervisors, Strainis, O'Rourke and Anzorena have attested to Burkard's wearing an improper uniform. These supervisors can recall multiple occasions on which Burkard was observed out of complaince with the uniform policy, however, each of Burkard's supervisors could not recall when they spoke to Burkard regarding her alleged uniform violations. [Anzorena Depo. pp.49-50],[Strainis Depo. pp.71], [O'Rourke Depo. pp. 28-29].

Each of these supervisors could not agree on how Burkard's uniform was out of compliance. Strainis testified that Burkard's undershirt had a "gray stripe on the sleeves" [Strainis Depo. pp. 68-69]; Anzorena testified that it was "grey longsleeve undershirt" [Anzorena Depo. pp.55]; and, O'Rourke testified that it was "gray long underwear" and sometimes it was blue or black [O'Rourke Depo. pp.72].

Stranis who was responsible for managing five of Finner's stores throughout central Indiana [Strainis Depo. pp. 9-10], including the East 86th Street store where Plaintiff worked, testified during his deposition that he was was repsonible for ensuring enforcement of Finner's Polcieis and Procedures in a non-discriminatory manner, but he also tells us that enforecment of

11

policies and procedures under his supervision a "hit-and-miss", and not consistently enforced [Strainis Depo. 71-75].

It appears uniform noncompliance appears to be a commonplace occurrence and a generally accepted practice by Finner. Strainis testified that he would see uniform violations occuring in his stores on a "day-to-day basis" [Strainis Depo. pp. 76] O'Rourke testified that Burkard had worked every day of her employment out of uniform [O'Rourke Dep. pp.72]. Anzorena testified that other employees had come to work out of uniform and were sent home, however, Burkard was never afforded the same opportunity as other employees to be sent home when allegedly out-of-uniform [Anzorena Depo.pp 51]. Uniform policy enforcement appears to be arbitrary and capricious at best. O'Rourke testified that Serena Burkard was the only employee at the Nora store to be dischrged for a uniform violation [O'Rourke Dep. pp 47-48].

Finner has another policy, which isn't enforced as well. The Additional Rules for Management [Exhibit J] addresses what happens when an employee is at work and is out of complaince with the Uniform Policy. Rule No.3 provides: *if any employee is out of uniform while at work, the manager may be subject to termination of employment or loss or elimination of a bonus*. Stranins testified that he never instituted discpline against Store Manager O'Rourke despite his telling O'Rouke on 'mulitple occasions' that Burkard was allegedly out of complaince with the uniform policy [Strainis Depo.74-75].

Based on the production of defendants documents and records in the instant matter, during the term of Plaintiff's employment, the only documented disciplinary action ever taken for uniform non-complaince at the East 86th Street location was against Serena Burkard.

## IV.     ARGUMENT

A.     **The Standard On Summary Judgment**

12

The issue on summary judgment is "whether a rational trier of fact could reasonably find for the party opposing the motion with repsect to the particular case, *Medina v. Time Ins. Co.,* 3 F. Supp. 2d 996, 997 (S.D. Ind. 1998); *Holtz v. Hillard*, 1 F. Supp. 2d 887, 889 (S.D. Ind. 1998). It is well settled in this Circuit that "[s]ummary judgment is appropriate <u>only</u> when the materials before the Court demostrate that there are no genuine material issues of fact and the moving party is entitled to judgment as a matter of law." *Sarsha v. Sears, Roebuck & Co.,* 3 F. Supp. 3d 1035, 1038 (7th Cir. 1993) (emphasis added).

Summary judgment was not designed to be a 'paper trial', *Waldridge v. American Hoechst Corp.,* 24 F. 3d 918, 920 (7th Cir. 1994). Nor is it a substitute for a trial on the merits, *Shager v. Upjohn Co.,* 913 F. 2d 398, 403 (7th Cir. 1990). The Court's job does not include weighing the evidence, or determining credibility issues, *Giannpooulos v. Brach & Brock Confections, Inc.,* 109 F. 3d 406, 410 (7th Cir. 1997) (and cases cited therein). Instead, resolving inferences in a light most favorable to the nonmoving party, it is to determine whether the evidence reveals any genuine issue of material fact. <u>Id.</u> If so, the case must go to the jury.

      B.      **Burkard's Claim of Pegnancy and Gender Discrimination**

           1.   <u>The Substantive Law</u>

The Pregnancy Discrimination Act ("PDA") provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. 2000e(k); *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 735 (7th Cir. 1994); *Hunt-Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago,* 104 F.3d 1004, 1010 (7th Cir. 1997). Unlawful discrimination is established when pregnancy is the motivating factor for an adverse

employment decision, *Kennedy v. Schoenberg, Fisher & Newman, Ltd*., 140 F.3d 716, 722 (7th Cir. 1998).

Title VII of the Civil Rights Act of 1964 prohibits an employer from discharging an employee because of sex. 42 U.S.C. § 2000e-(2)(a)(1). The Pregnancy Discrimination Act "brought discrimination based on pregnancy within a woman's protections against sex discrimination," *Hunt-Golliday v. Metro. Water Reclamation Dist.,* at 1010. Discrimination "because of" sex thus includes discrimination because of pregnancy. 42 U.S.C. § 2000e(k); *Hall v. Nalco*, 534 F.3d 644, 645 (7th Cir. 2008); *Dormeyer v. Comerica Bank-Illinois*, 223 F.3d 579, 583 (7th Cir.2000) (explaining that the PDA forbids "discrimination against an employee on account of her being pregnant"); *Maldonado v. U.S. Bank*, 186 F.3d 759, 762 (7th Cir.1999) ("Congress amended Title VII in 1978 to explicitly extend protection to pregnant women.").

"To prove pregnancy discrimination, [a plaintiff] may use the direct or indirect methods outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), or she can combine both approaches." *Salgado v. B and B Maintenance, Inc*., Slip Copy, 2009 WL 57509; U.S. Dist. LEXIS 977 (N.D.Ill. Jan. 5, 2009) (citing *Simple v. Walgreen Co*., 511 F.3d 668, 670-71 (7th Cir. 2007).) "A plaintiff proceeding under the direct method survives summary judgment by creating triable issues as to whether discrimination motivated the adverse employment action of which he [or she] complains." *Nagle v. Village of Calumet Park*, 554 F.3d 1106, at *4 (7th Cir. 2009) (citing *Lewis v. Sch. Dist. # 70*, 523 F.3d 730, 741 (7th Cir.2008)).

Burkard alleges her employment was terminated in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") as amended, and the Preganacy Discrimination Act ("PDA"). Plaintiff can prove discrimination under Title VII and the PDA by presenting direct or circumstantial evidence that an employer took an adverse job action against her because of her gender and/or

14

pregnancy (direct method) or by "constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision maker(s)'" (indirect method), *Olson v. Northern FS, Inc.,* 387 F. 3d 632, 635 (7th Cir. 2004). (quoting *Ceruitti v. BASF Corp.,* 349 F. 3d 1055, 1060 (7th Cir. 2003).

    2.  Burkard Establishes a *Prima Facie* Case of Discrimination

The Seventh Circuit has recognized that "[t]he burden of establishing a prima facie case of disparate treatment is not oneruous," *Johnson v. Artim Transportation Systen, Inc.,* 826 F. 2d 538, 542 (7th Cir. 1987) quoting *Texas Dept. of Comm. Affiars v. Burdine,* 450 U.S. 248, 253 (1981). Indeed, the Seventh Circuit has confirmed that a "*prima facie* case method established in *McDonald Douglas v. Green,* 411 U.S. 792 (1973) was "never intended to be rigid, mechanized, or ritualistic." *Olson,* 387 F. 3d at 635.

Finner does not challenge the fact that Burkard was a member of a protected class (pregnant female), or that she suffered an adverse employment action, i.e., employment termination. Finner does, however, assert that Burkard cannot establish that she was meeting Finner's legitimate business experctations, and that similarly-situated employees, who were not of the protected class, were treated more favorably. Finner is wrong. As discussed below, under the facts of this case, Burkard easily establsihes her prima facie case of discrimination.

    a.  Burkard Met Finner's Legtimate Business Expectations

Finner argues that Burkard cannot establish that she met Finner's legitimate business expectations because she violated Finner's Attendance and Uniform policies. Finner relies upon this same reason as its "legitimte, nondiscriminatory reason" for discharging Burkard. Under these circumstances, the Seventh Circuit has held that this prong of the prima facie case and the issue of pretext focuses on the same circumstances and should be "scruntized with respect to matter of

15

pretext." *Gordon v. United Airlines, Inc.,* 246 F. 3d 878, 886 (7th Cir. 2001). In *Vanasco v. National-Louis University,* 137 F. 3d 963 (7th Cir. 1998), the Seventh Circuit stated:

> [W]e have previously noted that "in many employment discrimination cases, the second element of the prima facie case, staisfactory job performance, and the issue of pretext focus on the same circumstances because the employer maintains the discharge was based on its reasonable belief that the employee was not performing in an acceptable manner", *Denisi v. Dominic's Finer Foods, Inc.,* 99 F. 3d 860, 864 (7th Cir. 1996). Thus, although we recognize that the prima facie case is technically the first step in the burden shifting method, "we shall eschew a mechanical application of *McDonald Douglas* in this circumstance," *Fuka,* 82 F. 3d 1397, 1404 (7th Cir. 1996), and proceed to consider whether Mrs. Vanasco met her burden of showing pretext.

Id. at 966.

Here, the Court should consider the second prong of the prima facie case in tandem with Burkard's evidence of pretext. As demonstrated below, Finner's proffered reason for discharging Burkard is a pretext for unlawful discrimination. Accordingly, material issues of fact necessarily exist concerning whether Burkard met Finner's legitimate business expectations. Specifically, Burkard's evidence of pretext establishes that Burkard's violations of attendance and uniform policies were insufficient to motivate her discharge and that Finner's proffered reason is unworthy of credence. Under these circumstances, a trier of fact would conclude that Burkard was performing up to Finner's expectations because her violation of the attendance and uniform policies was not the real reason for her discharge.

  b. <u>Other Evidence That Indicates That it is More Likely than not that Burkard's Pregnancy was the Reason for her Discharge</u>

Plaintiff argues that in order to staisfy her *primia facie* case, she must must show she was disciplined more harshly than similarly-situated employees, not of the protected class, because of the the employer's ageist animus. Nonetheless, the record indicates that Burkard was treated less favorably than other similalry situated male employees.

16

      c.  <u>Burkard is Similalry-Situated to Edwin Figueroa, Samuel Becker and Alex Mondabach</u>

In *McDonald v. Sante Fe Trail Transportation Co.,* 427 U.S. 273 (1976), the Supreme Court stated that "precise equivalence in culpability between employees is not the ultimate question" with regard to the "similarly-situated" analysis. <u>Id</u>. at 283 n.11. Rather, the appropraite inquiry focuses on whether the employees engaged in acts of "comparable seriousness." *Id*. The Seventh Circuit has held that the simarily-situated analysis "normally entails a showing that two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct." *Radue v. Kimberly-Clark Corp.,* 219 F. 3d 612, 617 (7th Cir. 2000).

Here, Burkard is simarily situated to male employees Edwin Figueroa, Samuel Becker and Alex Mondabach. Each of these individuals were supervised by Store Manager O'Rourke; and each of these individuals was subject to Finner's Attendance Policy. Indeed, Figueroa, Becker and Mondabach never received any discipline for their tardies and absences. In fact, Stranis testified that these policies would be applied to all store employees without exception or discrimination (Strainis Depo. pp.43).

    3.  <u>O'Rourke Applied the Tardy and Absence Provisions of the Attendance Policy to Burkard and not to Similalry Situated Employees.</u>

O'Rourke applied provisions of the attendance policy only to Burkard during the course of Burkard's term of employment and not to similarly-situated male In-Shop and Driver employees. Figueroa, Becker and Mondabach did not receive discipline for tardiness or absences. Figueroa, Becker and Mondabach are just three examples of store employees who, judging from their chronic tardiness and absences, were subject to O'Rourke's application of Finner's Attendance Policy, but did not have the tardy and absence provisions applied to them.[4]

---

[4] Anzorena testified that five other In Shop/Driver employee(s) including Steven Kinser (male) tardy 114 times, absent 26 times and   Edwin Juarez (male) tardy 115 times, absent 9 times – had worse attendance records than Burkard and

17

Each of these individuals had multiple violations of Finner's Attendance Policy, yet Burkard was fired. Because the attendance policy was supposed to apply equally to Figueroa, Becker and Clements as well, and because it was applied in a disparate manner, material issues of fact exist concerning Burkard's claim of discrimination.

4. <u>Finner's Purported Reason for Discharging Burkard is Pretextual</u>

For its "legitimate, nondiscriminatory reason" Finner asserts that it fired Burkard for violating its attendance and uniform policies. Finner's purported reason is pretextual for unlawful discrimination. A plaintiff may demonstrate pretext by showing one of the following: (1) the proffered reason is factually baseless; (2) the proffered reason is not the actual motivation for the adverse employment action; or (3) the proffered reason is insufficient to motivate the adverse action, *Johnson v. City of Fort Wayne,* 91 F. 3d 922, 931 (7th Cir. 1996). Burkard relies on the third method.

"A showing that similarily-situated employees not belonging to the protected group received more favorable treatment can serve as evidence that the employer's proffered legitimate, nondiscriminatory reason for the adverse employement action was pretext for discrimination." *Gordon v. United Airlines* at 892 <u>quoting</u> *Graham v. Long Island R.R.,* 230 F. 3d 34, 43 (2nd Cir. 2000).

As discussed above, O'Rourke treated Figueroa, Becker and Clements and other similarly-situated employees more favorably than Burkard. Despite implementing attendance and uniform policies that facially applied to each of these individuals equally, Burkard was disciplined more harshly than her co-workers for similar conduct.

---

were not disciplined for attendance [Anzorena Depo. pp.43-46]. Anzorena also testified that Alex Mondabach (male) had a worse attendance record than Burkard and was not disciplined for his attendance [Anzorena Depo. 39-40].

18

The above evidence is sufficient to create material issues of fact concerning Finner's motivation for discharging Burkard. Accordingly, Burkard has presented sufficient evidence of pretext to preclude summary judgment.

## V. CONCLUSION

Burkard has presented sufficient evidence and pertinent legal authorities to demonstrate that there are genuine issues of material fact that preclude the grant of summary judgment on her claim. For the foregoing reasons, Burkard respectfully requests that Defendant's Motion for Summary Judgment be denied.

Respectfully submitted,

**PANICO LAW LLC**

/s/ John R. Panico_____
John Robert Panico 24039-48
9465 Counselors Row, Suite 200
Indianapolis, IN 46240
(317) 759-7464
jpanico@discriminationlawgroup.com

*Counsel for Serena Burkard*